Cindy H. COLE *v.* Randall E. COLE

CA 02-232 110 S.W.3d 310

Court of Appeals of Arkansas
Division II
Opinion delivered April 30, 2003

50

*Goodwin, Moore, Broadaway, Gray & Langley, LLP,* by: *Harry Truman Moore* and *Angela Bowden Gray*; and *Kutak Rock LLP,* by: *Ken Shemin,* for appellant.

*Barry E. Coplin, P.A.,* by: *Barry E. Coplin,* for appellee.

LARRY D. VAUGHT, Judge. This appeal involves the financial aspects of the dissolution of a twenty-five-year marriage. The trial court divided the marital estate, including the husband's interest in a medical practice and associated entities, and also awarded spousal and child support. Appellant Cindy Cole (wife) has appealed, taking issue principally with the division of the marital estate, the award of spousal support, and the award of child support. Appellee Randall Cole (husband) has cross-appealed on the issue of calculation of his income for child-sup-

port purposes. We have determined that the trial court's judgment should be reversed and remanded.

The parties were married in 1976, while husband was still in medical school. After the marriage, three children were born to the parties, with two having reached majority at the time of the divorce. Wife worked and supported the family while husband finished medical school and residency. After the parties returned from Florida in the mid-1980s, husband became associated with the Boozman-Hof Clinic ("Clinic"), the Boozman-Hof Surgery Center ("Surgery Center"), and the Genesis Partnership ("Genesis"). Husband filed a complaint for divorce, and wife answered and counterclaimed. Wife sought an unequal distribution of the marital property in her favor. The major issues at trial were the valuation of husband's interest in the surgery center and the distribution of the marital property.

■ ■ On appeal, equity cases, such as divorces, are reviewed *de novo*. *Skokos v. Skokos*, 344 Ark. 420, 40 S.W.3d 738 (2001). With respect to the division of property in a divorce case, we review the trial judge's findings of fact and affirm them unless they are clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Huffman v. Fisher*, 343 Ark. 737, 38 S.W.3d 327 (2001). In order to demonstrate that the trial court's ruling was erroneous, an appellant must show that the trial court abused its discretion by making a decision that was arbitrary or groundless. *Skokos v. Skokos, supra.*

■ Guidelines for the division of marital property are set forth in Ark. Code Ann. § 9-12-315(a)(1)(A) (Repl. 2002). Factors to be considered include the duration of the marriage, the estate of each party, and the "contribution of each party in acquisition, preservation, or appreciation of marital property . . . ." Ark. Code Ann. § 9-12-315(a)(1)(A)(viii).

## I. *Valuation of the Surgery Center*

At the time of trial, husband had a 50% interest in the surgery center, a 22.7% interest in the clinic, and a 22.7% interest in Gene-

sis. The clinic employs the personnel used in both the clinic and the surgery center and leases the employees to the surgery center. The clinic also provides administrative services such as accounting and marketing. Genesis owns the real estate and the equipment used by the clinic and surgery center. The parties agreed that husband's interest in Genesis was valued at $689,700. The parties also agreed that husband's interest in the clinic was valued at $100,000. Husband has a buy-sell agreement with Dr. William Hof, the owner of the other 50% interest in the surgery center. The agreement, effective May 4, 1998, but signed on December 28, 1998, valued the entire surgery center at $750,000. Husband testified that the $750,000 figure was arrived at without a fair market valuation but was based on what he and Dr. Hof felt they could afford to pay each other and still operate the surgery center. There was also an option given to Dr. John Billingsley to purchase a 15% interest in the surgery center for $406,855.59, dated March 1, 1999.

Wife's expert, Cheryl Shuffield, a certified public accountant, gave an exhaustive valuation of husband's interest in the surgery center. In her original report, she valued the interest at $1,526,100. With updated information, she valued the interest at $1,274,200, in order to account for the goodwill personally attributable to husband's presence. Husband presented two experts, Daniel Bernick and Michael Brown, neither of whom were certified public accountants. Bernick did not do an independent evaluation; instead, he reviewed Shuffield's report and changed certain assumptions made by Shuffield for discounts for lack of marketability (50% versus Shuffield's 10%) and lack of a controlling interest (31.5% versus Shuffield's 10%) to arrive at a value of $497,303. Bernick testified that, if he had done an independent valuation, he would have used a different methodology than that used by Shuffield. Brown agreed with Bernick's basic approach and valued husband's interest at $297,500. Brown testified that he did not extensively review Shuffield's report. The trial court found husband's interest in the surgery center to be worth $375,000, the exact amount set forth in the buy-sell agreement.

This is a case in which we are left with the firm conviction that the trial court made a mistake in valuing husband's interest in the surgery center at $375,000. Husband argues that the

trial court found his experts more credible than Ms. Shuffield and made a rough average of their values and the buy-sell agreement value to reach $375,000. This is not supported in the abstract and addendum before us. The only indication in this record of the court's reasoning when establishing the value at $375,000 is found in the posttrial hearing of September 20, 2001. During a colloquy with counsel for both parties, the trial court indicated that it would take a long time for husband to retire the debt payment to wife if the surgery center were valued at $1.2 million, and rhetorically questioned the value of the surgery center if husband became disabled. In response to a request to divide the stock in the surgery center, the court stated that, if he used another method of distribution, such as stock division, husband would quickly be bought out by Dr. Hof pursuant to the terms of the buy-sell agreement. We believe that these comments indicate that the trial court did not attempt to establish a fair market value but instead determined that it was bound by the value set in the buy-sell agreement. Arkansas law requires the use of the "fair market value" standard for valuing businesses in a marital property context. Ark. Code Ann. § 9-12-315 (Repl. 2002); *Crismon v. Crismon*, 72 Ark. App. 116, 34 S.W.3d 763 (2000).

A small minority of courts hold that, in a divorce, the non-shareholder spouse is bound by a shareholder valuation agreement entered into by the shareholder spouse. *Hertz v. Hertz*, 99 N.M. 320, 657 P.2d 1169 (1983) (holding that, where agreement set value the shareholder spouse could receive for the firm's goodwill, non-shareholder spouse was bound by that valuation so as not to receive a greater interest upon divorce than the shareholder spouse). *See also McDiarmid v. McDiarmid*, 649 A.2d 810, 815 (D.C. 1994) (holding that, where partnership agreement provided husband could not recoup value of goodwill in law firm, wife was bound). Another court has held that a shareholder's agreement can establish a "presumptive value" for the divorcing spouse's shares. *Stern v. Stern*, 66 N.J. 340, 331 A.2d 257 (1975).

■ The clear majority of courts hold that the value established in the buy-sell agreement of a closely-held corporation, not signed by the non-shareholder spouse, is not binding on the non-shareholder spouse but is considered, along with other factors, in

valuing the interest of the shareholder spouse. This was discussed by the West Virginia Supreme Court of Appeals in a case in which the divorcing husband had executed a buy-sell agreement with his medical corporation. In *Bettinger v. Bettinger*, 183 W.Va. 528, 396 S.E.2d 709 (1990), the court observed:

> [A] majority of courts which have considered a buy-sell agreement in a closely held corporation setting the stock value for equitable distribution purposes has determined that such an agreement should not be considered as binding, but rather should be weighed along with other factors in making a determination as to the value of such stock. *E.g., In re Marriage of Melnick*, 127 Ill. App.3d 102, 82 Ill. Dec. 228, 468 N.E.2d 490 (1984); *In re Marriage of Moffatt*, 279 N.W.2d 15 (Iowa 1979); *Rogers v. Rogers*, 296 N.W.2d 849 (Minn. 1980); *Bowen v. Bowen*, 96 N.J. 36, 473 A.2d 73 (1984); *Amodio v. Amodio*, 70 N.Y.2d 5, 516 N.Y.S.2d 923, 509 N.E.2d 936 (1987); *In the Matter of the Marriage of Belt*, 65 Or. App. 606, 672 P.2d 1205 (1983); *Bosserman v. Bosserman*, 9 Va. App. 1, 384 S.E.2d 104 (1989); *Arneson v. Arneson*, 120 Wis.2d 236, 355 N.W.2d 16 (Wis. App.1984). It is apparent that buy-sell agreements in a closely held corporation can be manipulated by the shareholders to reflect an artificially low value. This is why caution should be exercised in accepting their value for equitable distribution purposes.

*Id.* at 533-34, 396 S.E.2d at 714-15.

In a similar divorce case, the Virginia Court of Appeals rejected the argument that a restrictive buy-sell agreement on stock controlled the value to be assigned to the shareholder spouse's interest in the corporation, stating:

> In a majority of jurisdictions, the price set by a buy-out provision does not control the determination of value when the other spouse did not consent or was not otherwise bound by its terms. This is so even though the agreement was executed after the marriage. The reason for rejecting the value set by buy-out provisions is that they do not necessarily represent the intrinsic worth of the stock to the parties. Some courts, however, consider buy-out provisions a factor to be considered. Other jurisdictions hold that the terms of the restriction presumptively control value, while a small minority regard the value specified in the agreement as controlling.

. . . . The price established for buy-out purposes, however, is often artificial and does not always reflect true value. The very purpose of such provisions or agreements often is to discourage sales by restricting the price which could be realized to less than the actual value to the owner.

*Bosserman v. Bosserman*, 9 Va. App. 1, 6, 384 S.E.2d 104, 108 (1989) (citations omitted).

■ ■ In explaining the rationale for the majority view, some courts have noted that the issue is not the value the shareholder spouse would receive if he sold his shares, but rather the current value to the shareholder of his interest in the corporation. In *Bowen v. Bowen, supra,* the shareholder spouse had a minority interest in a closely-held corporation, subject to a buy-sell agreement that set a value that excluded the corporation's goodwill and other intangible assets. The court held that the buy-sell agreement would be considered but was not dispositive. *Id.* The court explained:

> [T]he defendant argues that the court should not value his interest above its buy-sell value, since if he must sell his shares, the price he would receive would be limited by the buy-sell restriction. But there should be no reason to sell the shares since the court can fashion the distribution so that a sale need not occur. Furthermore, to give the buy-sell agreement conclusive effect would not recognize the realities of the present situation: The shareholder will not sell the stock and, one hopes, will not die. In other words, he will continue to experience the benefits of being a 22% shareholder and an employee.

*Id.* at 48, 473 A.2d at 79. *See also Money v. Money*, 852 P.2d 1158 (Alaska 1993); *In re Marriage of Keyser*, 820 P.2d 1194 (Colo. App. 1991); *Drake v. Drake*, 809 S.W.2d 710 (Ky. App. 1991); *Bosserman v. Bosserman, supra.* In *Wilson v. Wilson*, 294 Ark. 194, 741 S.W.2d 640 (1987), *appeal after remand*, 301 Ark. 80, 781 S.W.2d 487 (1989), our supreme court appeared to allow consideration of the value contained in a stock purchase agreement as *one* factor to be considered in valuation of a medical practice. Because the trial court in this case relied solely on the buy-sell agreement and did not establish a fair market value, we reverse on this point.

## II. Other Marital Property Issues

As noted above, the trial court made an equal distribution of marital property. However, wife complains that this was improper. Part of wife's argument is based on the valuation of the surgery center. There are three other issues that wife raises in the total property distribution. We reverse on these issues so that the trial court can consider the valuation and distribution of marital property *in toto*. We briefly discuss these issues for guidance of the trial court on remand.

■ The parties had a membership at Pinnacle Country Club, valued at $30,000. This item was awarded to husband. There is no corresponding credit for one-half of this property interest in the decree and no explanation for this omission. While there is no requirement that each party receive a share of each item of marital property, section 9-12-315 requires an explanation for such unequal division. *See Harvey v. Harvey*, 295 Ark. 102, 747 S.W.2d 89 (1988).

■ Next, wife argues that the trial court erred in awarding her the marital residence and corresponding debt, rather than ordering the residence sold and the proceeds divided equally. The parties agreed that the marital residence was valued at $360,000, with a first mortgage of $59,906 and a second mortgage of $21,000. We do not believe the trial court could do anything other than order the property sold, give wife possession of the property until it would be sold at some future time, or leave the parties as tenants in common. Ark. Code Ann. § 9-12-317(a) (Repl. 2002). The trial court could not rely on section 9-12-317(c) in awarding wife the entire interest in the residence because that statute was not passed until 1997, after the parties acquired the property, and doing so would impair a vested interest. *See Hubbard v. Hubbard*, 251 Ark. 465, 472 S.W.2d 937 (1971).

■ Third, wife argues that husband exercised an option to purchase a condominium for $325,000 after the parties separated but before the divorce decree was entered. Husband testified that he had exercised his option but had not closed on the property. As defined in section 9-12-315, marital property is *all* property acquired subsequent to marriage except for those seven categories specifically listed. Generally, options acquired during the mar-

riage are marital property, even though the option is not exercised until after the divorce. *Richardson v. Richardson*, 280 Ark. 498, 659 S.W.2d 510 (1983); *Dunavant v. Dunavant*, 66 Ark. App. 1, 986 S.W.2d 880 (1999). Therefore, to the extent husband acquired an enforceable interest in the condominium, he acquired marital property subject to division.

### III. Alimony

Wife appeals the trial court's decision to award her what the decree labels rehabilitation alimony of $3,000 per month for four years. She contends that her needs and husband's ability to pay justify a higher award. The trial judge indicated in the decree that he could have found that there was no "need" for alimony.

The decision whether to award alimony is a matter that lies within the trial judge's sound discretion, and on appeal this court will not reverse a trial judge's decision to award alimony absent an abuse of that discretion. *Ellis v. Ellis*, 75 Ark. App. 173, 57 S.W.3d 220 (2001). The purpose of alimony is to rectify economic imbalance in the earning power and the standard of living of the parties to a divorce in light of the particular facts of each case; the primary factors that a court should consider in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Id.* In fixing the amount of alimony, the courts consider many factors, including (1) the financial circumstances of both parties, (2) the couple's past standard of living, (3) the value of jointly owned property, (4) the amount and nature of the parties' income, both current and anticipated, (5) the extent and nature of the resources and assets of each of the parties, (6) the amount of income of each that is spendable, (7) the earning ability and capacity of each party, (8) the property awarded or given to one of the parties, either by the court or the other party, (9) the disposition made of the homestead or jointly owned property, (10) the condition of health and medical needs of both husband and wife, (11) the duration of the marriage, and (12) the amount of child support. *Boyles v. Boyles*, 268 Ark. 120, 594 S.W.2d 17 (1980). Neither this court nor the supreme court has ever attempted to reduce the amount of alimony to a mathematical formula. *Mitchell v. Mitchell*, 61 Ark. App. 88, 964 S.W.2d 411 (1998). Presumably, it has been thought that the need for flexibil-

ity outweighs the corresponding need for relative certainty. *Id.* The court should also consider the family support chart in determining the amount of spousal support to be paid. *Schumacher v. Schumacher*, 66 Ark. App. 9, 986 S.W.2d 883 (1999). Moreover, in the absence of a settlement agreement to the contrary, an award of alimony is always subject to modification, upon application of either party. *Bracken v. Bracken*, 302 Ark. 103, 787 S.W.2d 678 (1990); *Holaway v. Holaway*, 70 Ark. App. 240, 16 S.W.3d 302 (2000). *See also* Ark. Code Ann. § 9-12-314 (Repl. 2002).

██ ██ Here, we have reversed the division of marital property, a major part of the *Boyles* factors to be considered listed above. Alimony and property divisions are complementary devices that a trial judge employs to make the dissolution of a marriage as equitable as possible. *Davis v. Davis*, 79 Ark. App. 178, 84 S.W.3d 447 (2002). Further, there is no indication that the trial judge considered the family support chart in setting the amount of alimony. In *Schumacher, supra*, this court reversed an award of alimony where the trial court referred to an award of separate maintenance made by another court and where the record did not show that the trial court made reference to the chart. Under these circumstances, we believe that it would be best to reverse and remand this issue to the trial court in order to consider all relevant factors when determining the amount of alimony that should be awarded, including the family-support chart. *Hoover v. Hoover*, 70 Ark. App. 215, 16 S.W.3d 560 (2000).

## IV. Child Support

Both parties appeal the trial court's calculation of husband's income and the corresponding award of child support. The trial court found husband's annual net income to be $292,571, based on an average. The average was based on husband's projection of his 2001 income as $227,573 and wife's contention that his income was $357,569. The trial court then calculated husband's monthly income as $24,400 but then used a monthly income figure of $24,405[1]. The trial court then applied the Administrative Order 10 percentage for one child (15%) to arrive at the monthly child-support figure of $3,660.

---

[1] $292,571 divided by 12 equals $24,380.

 The amount of child support lies within the sound discretion of the trial judge, and the judge's finding will not be reversed absent an abuse of discretion. *McWhorter v. McWhorter*, 346 Ark. 475, 58 S.W.3d 840 (2001); *Kelly v. Kelly*, 341 Ark. 596, 19 S.W.3d 1 (2000); *Smith v. Smith*, 337 Ark. 583, 990 S.W.2d 550 (1999). The trial judge is required to refer to the child-support chart, and the amount specified in the chart is presumed to be reasonable. *Smith v. Smith, supra.* However, the presumption that the chart is correct may be overcome if the trial judge provides written findings that the chart amount is unjust or inappropriate. *Id.*

 It is the ultimate task of the trial judge to determine the expendable income of a child-support payor. *Stepp v. Gray*, 58 Ark. App. 229, 947 S.W.2d 798 (1997). This court has stated that the trial judge "may not simply utilize one of the definitions of income found in the tax code, particularly in the case of self-employed persons, to arrive at the true disposable income of the support obligor." *Id.* at 235, 947 S.W.2d at 801.

The version of the child-support chart applicable when this case was tried is found at *In Re: Administrative Order No. 10: Arkansas Child Support Guidelines*, 331 Ark. Appx. 581 (1998).[2] These guidelines provided that for self-employed payors, such as husband, the amount of support shall be calculated based on the last year's federal and state income tax returns and the quarterly estimates for the current year. *Id.* The trial judge should also "consider the amount the payor is capable of earning or a net-worth approach based on property, life-style, etc." *Id.*

 We believe that we should reverse the award of child support as well. First, the award was based, in part, on an average of husband's income for 1999 and 2000. The revaluation and redistribution of the marital property may affect husband's income. Second, husband's 2001 income was, by his own testimony and that of Dr. Hof, going to be reduced because of several

---

[2] The most recent revision of the child-support guidelines, *In Re: Administrative Order No. 10: Arkansas Child Support Guidelines*, 347 Ark. Appx. 1064 (2002), became effective on February 11, 2002. This version now provides that for self-employed payors, the amount of support shall be calculated based on the last two years' federal and state income tax returns.

unusual circumstances. Further, husband's Affidavit of Financial Means lists expenses that should not be allowed under Administrative Order 10, such as college expenses for the two adult children, charitable contributions, country club/athletic club fees, and college bonds. While it is clearly permissible to consider financial obligations of the payor spouse, including support of other children, the trial court should make a written finding regarding why it took such expenses into account. *Guest v. San Pedro*, 70 Ark. App. 389, 19 S.W.3d 62 (2000); *Department of Human Servs. v. Forte*, 46 Ark. App. 115, 877 S.W.2d 949 (1994).

Reversed and remanded.

STROUD, C.J., and NEAL, J., agree.