James M. MASON *v.* America A. MASON

CA 02-746                               111 S.W.3d 855

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered May 7, 2003

*Boyd & Buie*, by: *Rufus T. Buie, III*, for appellant.

*John H. Bell*, for appellee.

ANDREE LAYTON ROAF, Judge. James M. Mason appeals the White County Circuit Court's order changing custody of the parties' two minor children to his ex-wife, America Ann Mason Hood. Mason argues that because his circumstances as custodial parent had not materially changed, the trial court erred in changing custody to Mrs. Hood even though her circumstances had radically improved. We affirm.

Mason and Hood were divorced by decree dated April 6, 2001. After a hearing, the trial court awarded custody of the parties' two minor children, a boy born in 1997 and a girl born in 2000, to Mason. At the time, Hood had no job, had moved into a trailer with two other people, had no transportation, and had not completed high school. The trial court found that, because of the situation Hood was in, she was not in a position to take care of the children and awarded custody to Mason, who continued to reside with his parents and brother. Hood was not required to pay child support, and Mason was required to transport the children to Hood for visitation.

On August 20, 2001, Hood filed a petition for change of custody; the petition was heard on March 6, 2002, a year after the final divorce hearing. At the hearing, Hood, her new husband, Ricky Wayne Hood, and her mother, Carolyn Murrah, testified about the changes in Hood's circumstances. The Hoods married

on March 22, 2001, and have a daughter who was born in December 2001. Ricky Hood has a two-year degree and is working toward a bachelor's degree in engineering. He is employed as an electronics technician at an average annual salary of $50,000. The Hoods have a three bedroom, two bathroom home. Since the divorce, America Hood has obtained a GED, taken classes in computer skills, and was taking an ACT preparatory class. She stopped working in November 2001 to stay at home with her new baby and attended school at night, with plans to return to work when this child reaches kindergarten age. Ricky Hood cares for the Hood's baby and the Mason children when they are there for visitation on the two evenings per week that Hood attends classes. Hood's mother testified that Hood was depressed at the time of the divorce, but had turned her life around "one hundred percent" since then.

Hood further testified that since the divorce, Mason's car had been repossessed and his home telephone disconnected. She stated that the children do not get the attention they need from him because they stay primarily with the grandparents. Hood also testified that she did not allow Mason to send clothes or other items with the children on their visitations with her because he was transporting roaches to her home in the bags, and her children had been bitten by roaches at the Mason home. However, Hood admitted that Mason had the same job, residence, and educational level that he had at the time of the divorce a year earlier and cited only repossession of his car and disconnection of his home telephone as changes in his circumstances.

Mason and his mother, Shirley Mason, testified on his behalf. Mason testified that his circumstances were unchanged since the custody hearing one year ago. He testified that he and the children reside with his parents and brother in a house with three bedrooms and one bath. This was also the parties' living arrangements and residence during their marriage. His grandfather resides in a trailer behind his parents' home. Mason's son sleeps with him in the home while his parents and his daughter spend nights in the grandfather's home because of the grandfather's health problems.

In response to Hood's assertion that his circumstances had worsened, Mason testified that his car had been repossessed because of the amount of work he had to miss in order to transport the children five hundred twenty miles round trip from Colt to Judsonia for Hood's weekend visitations, that he had replaced it with a pick-up truck and that other than being late one time when the brakes went out on his car, he had not failed to comply with the court's visitation transportation order. Mason testified that his family uses the telephone in his grandfather's nearby trailer and that the phone in the house was turned off because they were getting prank calls at all hours of the night. Mason admitted that he still had roaches in his home but denied that roaches had bitten his children, and he stated that they had not been able to rid the house of them despite spraying every two weeks.

Mason's mother testified that she takes care of the children while Mason is at work and that he spends a lot of time with them. She testified that the primary reason she quit her job was to care for her father, who had bypass surgery and has other health problems, and that she needs to stay at his trailer at night in case he needs assistance in going to the bathroom.

At the conclusion of the hearing, the trial court announced the decision to change custody to Hood. The trial court's following statements from the bench are pertinent to our review of this case:

> At the conclusion of the case last time I made the remark that I was reluctant to place these minor children with them, but, because of the situation with the mother, I felt I had no choice. I did so because they didn't have any other place to go. I thought it would probably be best if they would be with their mother, but she simply wasn't in the shape to take care of them, in my judgment, and I mentioned if she got over this situation and demonstrated a change in circumstances and got her feet on the ground, knew where she was going, what would be in their best interest, that it might be different.
>
> The thing that disturbed me then was the dismal existence that these people had as a couple, living where they did, and I think it was inevitable that they split up because of that. The father had some problems at that time, he was in depression too, but I nor-

mally don't take chances with kids if I feel like that they're not going to be looked after, but she has made a remarkable change. I'm really a little surprised. I guess I'm quite cynical because I hear these things every day and I·see people every day, but there is not any doubt she has made a radical change in her life. She has married well in my opinion. I think he's a fine man. They have a stable home. She's improved her educational situation. She has a way to go, but she's remarkably changed in that regard and her attitude and physical well-being are much better, so I think she has done exactly what I said she ought to do.

It's been quoted to me that if there is not a change in the custodial parent, then you can't do it. That may be true in some situations. I'm not sure it would apply to this case. I commend the father for hanging on, but there are some problems there. I don't think they have prospects there in terms of their full potential, in terms of education. I mean the girl has rarely been mentioned during this entire hearing, and I think the father is very attached to his son, he's sleeping with him, which I don't think is a particularly good thing, and his mother is pretty much raising the girl. These kids are approaching school age, and they're going to have to be prepared for it, and I don't believe that they have been prepared for it, and I think that is something that has to be done.

I don't know but what they're not going to have is the same prospects that they had over there, and that doesn't mean he doesn't love his children, but there is more to them than just loving them, we have to build their personalities, we have to build their hopes. These people, in my opinion, are still into paybacks to each other for the anger and wrongs that they committed to each other, and I think the kids are in the middle, and I don't have any doubt they'll be better off with her, so I'm going to find there is a change of circumstances, both positive in her behalf and the fact that things are not going as well as they should have in the other home, and so I'm going to change the custody.

The trial court's written order changing custody further states in pertinent part:

The Court finds that there has been a material change in circumstances, namely the Plaintiff, America A. Mason Hood, has exhibited exemplary changes in her lifestyle which include securing her high school diploma through G.E.D. and securing a stable home. Her new husband seems to be a good man. He is a

hard-working, decent man and able to fulfill the role of a husband and a father. He is sensitive to the needs of the children. The Plaintiff and her husband will provide an atmosphere for a better education for the children.

On the other hand, while the Defendant is a man doing his best, there are not good prospects for the welfare of the children if he keeps them. The girl is rarely mentioned by him. The Defendant's circumstances have deteriorated; he has recently lost his telephone and transportation. His mother is the primary caregiver for the children and also cares regularly for the Defendant's grandfather who lives next door.

The trial court awarded custody to Hood, with Mason to have alternate weekends and other customary visitation. Mason appeals from this order.

■ On appeal, Mason contends that his circumstances have not materially changed and that under Arkansas case law, the changes made solely by Hood are not sufficient to justify change of custody. Mason argues that while Hood has made positive improvements in her lifestyle since the divorce, these changes were insufficient to make a wholesale change of custody. Arkansas law is well settled that a judicial award of custody will not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree will be in the best interests of the children. *Campbell v. Campbell*, 336 Ark. 379, 384, 985 S.W.2d 724, 727 (1999); *Feight v. Feight*, 253 Ark. 950, 490 S.W.2d 140 (1973).

■ In order to avoid relitigation of factual issues already decided, courts will usually restrict evidence in a modification proceeding to facts arising since the prior order. *Id.* The only other time a change is permissible is when there is a showing of facts affecting the best interests of the children that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered. *Id.; Jones v. Jones*, 326 Ark. at 491, 931 S.W.2d at 772 (1996); *Henkell v. Henkell*, 224 Ark. 366, 273 S.W.2d 402 (1954) (stating that it is well settled that a decree fixing the custody of a child is final on conditions then existing and should not later be changed unless there are altered conditions since the decree was rendered or there

were material facts existing at the time of the decree but unknown to the court, and then only for the welfare of the child). The party seeking modification of the custody order has the burden of showing a material change in circumstances. *Jones*, 326 Ark. at 491, 931 S.W.2d at 772.

In child custody cases, we review the evidence *de novo*, but we will not reverse the findings of the court unless it is shown that they are clearly contrary to the preponderance of the evidence. *Thompson v. Thompson*, 63 Ark. App. 89, 974 S.W.2d 494 (1998). We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child custody cases. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). We have often stated that we know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Watts v. Watts*, 17 Ark. App. 253, 707 S.W.2d 177 (1986). A finding is clearly against the preponderance of the evidence, when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999) (holding that the noncustodial parent's remarriage, the custodial parent's move, and the passage of time, when examined in the aggregate, supported a change in custody).

Mason relies heavily on *Jones v. Jones, supra*, to support his argument that the non-custodial parent's remarriage and financial improvements are insufficient to establish the requisite changed circumstances. In *Jones*, the father remarried and filed for a change of custody of the parties' children, citing, in part, his subsequent remarriage. *Id.* at 143, 78 Ark. App. at 394. The *Jones* court held that remarriage alone was not a sufficient reason to change custody. The court also stated that because the father was aware of the alleged change in circumstances at the time of the custody agreement, he could not use those changes as grounds to modify custody. *Id.; see also Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002). In *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999), the supreme court narrowed its holding in *Jones*, noting that its decision merely underscored the rule that changes in circumstances of the non-custodial parent, including a

claim of improved life because of remarriage, are not alone suffi-
cient to modify an order of custody. Morever, this court has
refused to modify custody merely because one parent has more
resources or income. *Malone v. Malone*, 4 Ark. App. 366, 631
S.W.2d 318 (1982). However, Mason's argument is unpersuasive.

██ ██ We find the facts of this case to be distinguishable
from those of the authorities relied upon by Mason. Here, the
same judge who presided over the initial custody proceeding also
heard the petition for change of custody a year later. In the first
proceeding, the trial court clearly had serious reservations about
placing the parties' young children in Mason's custody, based on
the "dismal existence" and other circumstances in Mason's home,
and did so only because he concluded that Hood was in no posi-
tion to have custody at that time. However, at the subsequent
hearing, Hood demonstrated that she had significantly improved
her circumstances in regard to her stability, employment, remar-
riage, pursuit of educational goals, and the ability to be a stay-at-
home mother to her young children. The trial court found that
the radical improvement in Hood's circumstances, along with the
fact that Mason's already dismal circumstances had further deterio-
rated, justified the change in custody to Hood. The trial court
stated that he did not have "any doubt" that the children would be
better off with Hood. The trial court's opinion was clearly based
on more than simply economic factors. We cannot say that, under
the particular circumstances of this cases, and given our deference
to the superior position of the trial court on child custody cases,
the trial court's decision to change custody based upon a radical
and positive change in Hood's circumstances, coupled with evi-
dence of a further decline in Mason's already dismal circum-
stances, was clearly erroneous.

Affirmed.

STROUD, C.J., BAKER, and NEAL, JJ., agree.

GRIFFEN and GLADWIN, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. I must
respectfully disagree with the majority decision in this
child custody appeal where the trial court granted a change in

custody based on a petition filed by the noncustodial parent only four months after the parties were divorced. No matter how one may couch it, today's decision will trivialize the effect of child custody determinations when parents divorce, and will produce unnecessary and harmful instability. Because I believe that our longstanding case law in this area should not be disturbed, particularly on these facts, I would reverse and remand.

The parties were married on January 30, 1995, and are parents of two children: a son (Shawn Michael Mason) born on April 2, 1997, and a daughter (Brittany Ann Mason) born on August 29, 2000. The parties separated on or about November 23, 2000. The trial court entered the divorce decree on April 6, 2001, following a hearing on March 19, 2001. When the trial judge entered the divorce decree on April 6, 2001, he expressed a preference for granting custody to the appellee (mother), but found she was in no position to care for the two minor children. Four months later, on August 20, 2001, appellee filed a petition to modify custody based on her remarriage, the fact that she had obtained a G.E.D. certificate, her employment, and her ability to provide a stable environment. At the hearing on her petition to modify custody, appellee testified that she obtained her G.E.D. certificate and was taking an ACT prep course twice a week in hope of attending college. She now lives in a house with three bedrooms and two bathrooms so that Shawn would have his own room while Brittany would share a room with appellee's daughter by her current husband. Appellant married Ricky Hood on March 22, 2001, and their daughter (Carissa Brianne Hood) was born on December 29, 2001. Ricky Hood testified that he worked as a manufacturing technician and earns on the average of $50,000 a year. According to Hood, appellee will stay home until Carissa enters kindergarten.

Appellee testified that she was concerned about the living conditions her children experienced with appellant. She mentioned that Brittanny appeared to have roach bites on her arms, that appellant's phone has been disconnected, that appellant's mother appears to be the primary caretaker of the children in addition to taking care of her ailing father, that appellant and his mother have not prepared Shawn to enter kindergarten, and that

appellant's car had been repossessed. Yet, appellee also testified "Matt is still living in the same home and location as he was at the last hearing we had and even before that when we all lived there for quite a while during my marriage. I have said that there's nothing that has changed with regard to Matt Mason to my knowledge."

Unlike my colleagues who make up the majority, I see nothing in this case that warrants departing from the long-settled law regarding modification of child-custody decisions. The primary consideration when modifying custodial orders is the best interest and welfare of the child; all other considerations are secondary. *Fitzpatrick v. Fitzpatrick*, 29 Ark. App. 38, 776 S.W.2d 836 (1989). However, an order changing custody cannot be made without proof showing a change in circumstances from those existing at the time the original custody order was made. *Riley v. Riley*, 45 Ark. App. 165, 873 S.W.2d 564 (1994). Custody awards are not made or changed to gratify the desires of either parent, or to award or punish either of them. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999). If there is no showing of a material change of facts, there must be a showing of facts affecting the child's best interest that were not presented to or known by the court at the time the original custody order was entered. *Riley v. Riley, supra*. This is because the original custody order constitutes a final adjudication that one parent or the other was a proper person to have care and custody of the child and before an order can be made changing the status, there must be proof justifying a change in custody. *Fitzgerald v. Fitzgerald*, 63 Ark. App. 254, 976 S.W.2d 956 (1998). Appellee, as the moving party, has the burden of proving a material change in circumstances and that the change was in the best interests of the children. *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). Furthermore, the supreme court has stated that courts generally impose more stringent standards for modifications than for initial determinations of custody, *Jones v. Jones, supra*, and that more stringent standards for modification of custody determinations are required "to promote stability and continuity in the life of the child." *Lloyd v. Butts*, 343 Ark. 620, 625, 37 S.W.3d 603, 606 (2001). We should be especially cautious about departing from this line of authority where the

supreme court has not suggested the need to change the standard for deciding petitions to modify child custody orders and where the record shows the trial court was fully aware of the facts surrounding appellant's residence when the initial custody decision was made. Contrary to the view advanced by the majority opinion, the facts in this case prove the wisdom of the existing standard, rather than present an excuse for disobeying it.

Furthermore, the facts of this case should give us even greater reason to hesitate before departing from well-established precedent. Appellee apparently complained about appellant's residence and living conditions to social services; however, her complaint was unfounded, and was lodged despite her admission that she had not been to appellant's residence since the March 19, 2001, hearing at which the original custody award was made. For all her complaints about appellant's living situation, it is the same situation the trial court knew about when the original custody determination was made only months before appellee petitioned to have it modified. I refuse to ignore the rather telling fact that appellee remarried and had a child by her new husband within a year of the time she was divorced from appellant. Indeed, it seems she may have been expecting the child born of her current husband when she filed the petition to change custody four months after the divorce.

The supreme court has stated that remarriage and improved financial circumstances on the part of the noncustodial parent do not, standing alone, constitute a material change of circumstances. We should reverse the trial court's decision in obedience to that principle. By refusing to do so, the majority sends a dangerous signal that a noncustodial parent can upset even a recent custody determination and destabilize the life that children are trying to build with the custodial parent following the trauma of divorce by merely choosing a new mate whose financial condition can be leveraged to foster an image of economic superiority to the custodial parent. Child custody decisions deserve more respect than that from judges, if from no one else.

I respectfully dissent and am authorized to state that Judge GLADWIN joins this opinion.